**Per A. Ramfjord, OSB No. 934024**
per.ramfjord@stoel.com
**Kennon Scott, OSB No. 144280**
kennon.scott@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, Oregon 97205
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

      Attorneys for Plaintiff Nike, Inc.


## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION


| | |
|---|---|
| NIKE USA, INC., an Oregon corporation, | Case No. 3:16-cv-00743-SB |
|     Plaintiff, | |
| v. | **PLAINTIFF NIKE USA, INC.'S REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| BORIS BERIAN, an individual California resident, | |
|     Defendant. | |


PLAINTIFF NIKE USA, INC.'S REPLY IN FURTHER SUPPORT OF ITS
MOTION FOR PRELIMINARY INJUNCTION

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... ii

I.     INTRODUCTION ........................................................................................... 1

II.    FACTUAL BACKGROUND ........................................................................... 2

III.   ARGUMENT ................................................................................................. 10

       A.     Nike Is Likely to Succeed on the Merits That a Contract Existed Between
              Nike and Defendant as of January 22, 2016 ...................................... 10

              1.     Nike Matched the New Balance Offer ...................................... 10

              2.     A New Contract Was Formed upon Nike's Match of the New
                     Balance Offer .......................................................................... 12

              3.     Nike Did Not Repudiate Its Match of the New Balance Offer ............... 14

              4.     Injunctive Relief Is an Appropriate Remedy in This Case ..................... 17

       B.     Nike Will Suffer Irreparable Harm Absent an Injunction ................................. 17

       C.     The Balance Of Hardships Tips In Nike's Favor ............................................. 19

       D.     The Public Interest Is A Neutral Factor In This Case ...................................... 21

IV.    CONCLUSION ............................................................................................... 22

TABLE OF AUTHORITIES

Page

**Cases**

*Brownies Creek Collieries, Inc. v. Asher Coal Mining Co.*,
   417 S.W.2d 249 (Ky. Ct. App. 1967) ................................................................................16

*Circle K Stores, Inc. v. Zillman*,
   827 F. Supp. 2d 1251 (D. Or. 2011) ..................................................................................11

*Davis v. Iofredo*,
   713 N.E.2d 26 (Ohio Ct. App. 1998)..................................................................................16

*Doughty Appliance, Inc. v. White*,
   580 P.2d 186 (Or. 1978) .....................................................................................................13

*Houston Oilers, Inc. v. Neely*,
   361 F.2d 36 (10th Cir. 1966) ..............................................................................................17

*Hughes v. Misar*,
   76 P.3d 111 (Or. Ct. App. 2003)..........................................................................................14

*Lemat Corp. v. Barry*,
   275 Cal. App. 2d 671 (1969) ..........................................................................................17, 19

*Marquez Bros. Int'l v. Atletico Morelia S.A. De C.V.*,
   No. 5:05-CV-1889 RS, 2005 WL 1869501 (N.D. Cal. Aug. 5, 2005) ................................22

*MCA Records, Inc. v. Newton-John*,
   90 Cal. App. 3d 18 (1979) ..................................................................................................17

*Nike USA, Inc. v. Culpepper*,
   No. 02-868-JE, 2002 U.S. Dist. LEXIS 28777 (D. Or. July 24, 2002) ......................... passim

*Ocean Beauty Seafoods, LLC v. Pac. Seafood Grp. Acquisition Co.*,
   2016 WL 1554942 (9th Cir. Apr. 18, 2016) ....................................................18, 19, 21, 22

*Or. RSA No. 6, Inc. v. Castle Rock Cellular of Or. Ltd. P'ship*,
   76 F.3d 1003 (9th Cir. 1996) ...........................................................................................1, 16

*Pight v. Catlow-Steens Corp.*,
   No. CV-80-85, 1982 U.S. Dist. LEXIS 14975 (D. Or. July 1982)................................12, 13

*Pride v. Exxon Corp.*,
   911 F.2d 251 (9th Cir. 1990) ..............................................................................................16

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
   944 F.2d 597 (9th Cir. 1991) ..............................................................................................18

TABLE OF AUTHORITIES

Page

*United States v. Jenkins*,
    714 F. Supp. 2d 1213 (S.D. Ga. 2008)...................................................................21

*Wash. Capitols Basketball Club, Inc. v. Barry*,
    304 F. Supp. 1193 (N.D. Cal. 1969) ...........................................................17, 19

**Statutes**

*Or RSA No. 6*,
    76 F.3d at 1007 *RSA No. 6*...................................................................16

**Other Authorities**

*Irreparable Injury, Black's Law Dictionary* (10th ed. 2014) .......................................18

Nike USA, Inc. ("Nike") submits this memorandum to supplement the brief it filed in support of its Motion for Temporary Restraining Order and Order to Show Cause Why Preliminary Injunction Should Not Issue (Dkt. No. 6) (the "Motion") and to reply to Defendant Boris Berian's ("Defendant") Opposition thereto (Dkt. No. 27) ("Opposition" or "Opp'n").   The Court granted Nike's Motion and entered a temporary restraining order on June 8, 2016 (Dkt. Nos. 23-24).  The preliminary injunction hearing is set for June 22, 2016 at 2:00 p.m.

This brief is supported by the declarations of Kennon Scott ("Scott Decl.") and Ben Cesar ("2nd Cesar Decl."), filed herewith; the Declaration of Ben Cesar ("Cesar Decl."), filed with the Motion; and all other pleadings, evidence, and arguments presented by the parties in this case.

## I.  INTRODUCTION

Every contract under Oregon law has a duty of good faith and fair dealing, and a party's right of first refusal cannot be thwarted through artifice.  *See Or. RSA No. 6, Inc. v. Castle Rock Cellular of Or. Ltd. P'ship*, 76 F.3d 1003, 1007 (9th Cir. 1996).  At his deposition, Boris Berian explained that his agent, Merhawi Keflezighi, intended to thwart Nike's matching rights as follows:

> A:     During all this Hawi told me that Nike *couldn't* match, so that's what I was thinking the whole time.
>
> Q:     Couldn't match you say?
>
> A:     Yes.
>
> Q:     So Hawi was telling you that Nike could not match the New Balance offer; is that correct?
>
> A:     Yes.
>
> Q:     Okay.  Did he say why?
>
> A:     With mainly the affiliation.

Page 1    -    PLAINTIFF NIKE USA, INC.'S REPLY IN FURTHER SUPPORT OF ITS
               MOTION FOR PRELIMINARY INJUNCTION

> Q:      Okay.  So putting that affiliation clause in the New Balance offer would make it impossible for Nike to match the New Balance offer?
>
> A:      Yes.

Scott Decl. Ex. 1, Transcript of the Deposition of Boris Berian ("Berian Depo") at 45:25-46:18 (emphasis added).

Defendant's attorneys filed a 41-page legal tome defending Mr. Keflezighi's plan, a plan which has landed Mr. Berian and Nike in court.  The brief calls upon every conceivable legal theory including the spirit of the first amendment in a herculean attempt to divert the Court from two simple truths: (1) Mr. Keflezighi predetermined that Defendant would contract with New Balance and acted in bad faith in an attempt to thwart Nike's right to match; and (2) his scheme went awry when Nike unequivocally matched the New Balance terms presented.  As the Court already found and as Defendant admitted in his deposition, Nike matched each and every term of the New Balance Offer presented.

The case is that simple and it should end right there with an order upholding Nike's contractual right.  Nike is not demanding that Defendant run in any particular race for Nike or otherwise perform any personal service; rather it is merely seeking an order that Defendant abide by his obligation not to wear the footwear of a Nike competitor if he chooses to compete in any race.  To hold otherwise is to allow the bad faith scheming of an agent, referred to euphemistically in Defendant's brief  as "an unpleasantly motivated act," Opp'n at 30 n.6, to triumph over the legitimate exercise of contractual rights.

## II.  FACTUAL BACKGROUND

In the summer of 2015, Defendant worked with an agent, Kimberly Holland, to secure a sponsorship agreement that would assist him in developing his running career.  Berian Depo. at

Page 2   -   NIKE USA, INC.'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

11:3-7. Defendant received offers from several companies, including Nike, New Balance, and Under Armour. *Id.* at 11:8-12. He chose Nike because it offered him the best deal. *Id.* at 11:13-14, 15:8-24. In this regard, Defendant had run in Nike shoes in high school and college, and while he had recently been running in New Balance, he elected to shift to Nike again as part of his sponsorship agreement. *Id.* at 12:24-13:3, 16:15-22.

Just a month after entering the agreement, on June 17, 2015, Defendant ran his fastest ever 800m race in Nike footwear, finishing with the fifth fastest time ever recorded by an American runner. *Id.* at 13:4-18. And as of December 2015 and early January 2016, his training—in Nike shoes—was going well. *Id.* at 14:1-17:14. Notably, throughout the term of the agreement, Defendant never complained about the fit of his Nike footwear or the level of communication he received from Nike.

> Q:     To your knowledge, before January 22nd, 2016, when Nike sent your agent a letter stating that it matched the New Balance offer, did you or your coach ever inform anyone at Nike that you had any problems wearing Nike footwear?
>
> A:     No.

*Id.* at 51:21-23.

In the fall of 2015, Defendant's coach introduced him to a new agent, Merhawi Keflezighi. Scott Decl. Ex. 2, Transcript of the Video Deposition of Merhawi Keflezighi ("Keflezighi Depo.") at 8:14-19. Mr. Keflezighi was already acting as the agent for Brenda Martinez, another member of the Big Bear Track Club, and had secured a sponsorship arrangement for her with New Balance. *Id.* at 8:20-25; Berian Depo. at 35:10-12. Beginning in November 2015, Mr. Keflezighi began discussions with New Balance on behalf of both Defendant and the Big Bear Track Club. Second Declaration of Merhawi Keflezighi (Dkt. No. 28) ("2nd Keflezighi Decl.") at ¶ 5. As Mr. Keflezighi wrote in an email to New Balance, he

was proposing "New Balance being a sponsor of the Big Bear Track Club and sponsoring Boris as part of that deal." Scott Decl. Ex. 3 (Depo. Ex. 3). He believed that negotiating both contracts together would increase his leverage over New Balance. Keflezighi Depo. at 23:21-24:3. Both agreements would start at roughly the same time—after the expiration of Defendant's contract with Nike. Berian Depo. at 25:16-26:3.

But there was one obstacle to achieving this goal: Nike's right of first refusal. This is because club contracts, of the sort Mr. Keflezighi was attempting to negotiate with New Balance, typically require that all club members compete in the sponsor's footwear and apparel. *Id.* at 23:3-23:22. Indeed, the draft club contract that New Balance ultimately proposed to Defendant's agent had a clause providing that the club shall "cause the Club members to not wear and/or use products manufactured by any competitor of New Balance . . . ." Keflezighi Depo. at 29:18-31:20. If Defendant were required to run in Nike footwear and apparel because Nike had matched New Balance's individual offer to him, his club could not satisfy this basic requirement.

Against this backdrop, Defendant's agent and Defendant openly discussed how they could avoid the right of first refusal provision in Defendant's contract with Nike and worked to include provisions in the New Balance Offer that would undermine Nike's ability to match. Berian Depo. at 29:15-32:14; Keflezighi Depo. at 38:10-41:24. The most significant of these was the affiliation clause, which provided that:

> New Balance shall permit ATHLETE to compete under the Big Bear Track Club affiliation, and athlete may wear the official uniform and footwear of Big Bear Track Club in all domestic competitions, including the US Indoor Championships and US Olympic Trials, in 2016.

Scott Decl. Ex. 4 at 6 (Depo. Ex. 6). As both Defendant and his agent testified in deposition, the goal of this provision was to make it difficult for Nike to match the New Balance Offer and to

Page 4    -    NIKE USA, INC.'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR
              PRELIMINARY INJUNCTION

potentially allow Defendant to run in New Balance footwear and apparel even if Nike actually matched the New Balance Offer.  Berian Depo. at 30:22-32:1; Keflezighi Depo. at 39:20-24. Indeed, Defendant testified that his agent told him that including the Affiliation provision would make it *impossible* for Nike to match the New Balance Offer.  Berian Depo. at 46:5-18. Moreover, this provision had no economic value to Defendant.  On the contrary, its sole purpose was to frustrate a Nike match, and Defendant's agent believed that it would achieve that goal. *Id*. at 46:10-18; Keflezighi Depo. at 38:22-41:15, 50:22-53:13.

On January 19, 2016, Defendant's agent transmitted the New Balance Offer to Nike with a cover email drawing attention to the affiliation provision, stating:

> I am now representing Boris Berian.  New Balance has submitted an offer for Boris, which Boris finds agreeable.  Pursuant to Section 5 of Boris' Nike agreement, I am submitting the New Balance offer to you.  In addition to the financial terms and the lack of reductions, we do consider the affiliation clause in the contract a material element of the offer.

Scott Decl. Ex. 6 (Depo. Ex. 10); Keflezighi Depo. at 50:22-52:17; *see also* Cesar Decl. Ex. 2. Ben Cesar of Nike acknowledged receiving the offer on the same day, but asked that it be provided on New Balance letterhead as required under Defendant's Nike contract.  Defendant's agent complied and re-sent the offer on December 20, 2015.  Scott Decl Ex. 7 (Depo. Ex. 11); *see also* Cesar Decl. Ex. 3.

Just two days later, on January 22, 2016, Mr. Cesar responded, forwarding a letter from John Capriotti of Nike, stating in pertinent part that "Nike matches the New Balance Offer" as set forth in the term sheet provided on January 20.  Scott Decl. Ex. 8 (Depo. Ex. 13); Keflezighi Depo. at 54:18-55:14; Berian Depo. at 38:15-39:12; *see also* Cesar Decl. Ex. 4.  The letter also included a copy of the term sheet with "Nike" inserted in lieu of "New Balance" to confirm the

match.  Scott Decl. Ex. 8  (Depo. Ex. 13) at 5-7; Keflezighi Depo. at 56:2-56:9; Berian Depo. at

41:2-10; *see also* Cesar Decl. Ex. 4 at 5-7.

In his deposition, Defendant admitted that this letter and attachment matched each and

every term of the New Balance Offer.  First of all, with respect to the letter, Defendant testified

as follows:

> Q :     Mr. Berian, you have in front of you what's been marked as
> Exhibit 13, which is an e-mail from Ben Cesar to Mr. Keflezighi
> dated January 22nd, 2016. And it attaches a letter from John
> Capriotti.  Do you see that?
>
> A:       Yes.
>
> Q:       Did Mr. Keflezighi show you this document?
>
> A:       Yes.
>
> Q :     Okay. If you look at the attached letter, the second sentence
> states: "This letter is to notify you that NIKE matches the New
> Balance offer as set forth in Attachment 2 and will enter into a new
> contract with Boris for the exclusive right and license for his
> 'Athlete Endorsement' in connection with the 'products' and/or
> NIKE brands (as each is defined in the Contract) and otherwise in
> accordance with the matched terms set forth in Attachment 2." Do
> you see that language?
>
> A:       Yes.
>
> Q:       And that language says that Nike matches the New Balance
> offer; correct?
>
> A:       Yes.

Berian Depo. at 38:15-39:12.  With respect to the attachment, Defendant further testified as

follows:

> Q:       So this provision or this document takes the New Balance
> offer and substitutes NIKE for New Balance in each and every
> term; correct?
>
> A:       Yes.

Page 6   -   NIKE USA, INC.'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR
                PRELIMINARY INJUNCTION

> Q:    So Nike was agreeing to match each and every term set forth in the attachment from New Balance, the New Balance Boris Berian Compensation and Bonus Schedule; correct?
>
> A:    Yes.

*Id.* at 41:2-10.  Finally, Defendant also admitted that there was nothing in the cover letter from Mr. Capriotti indicating that Nike was somehow declining to match the New Balance Offer because it did not include reductions:

> Q:    Now there's nothing in this letter that says that Nike will not agree to the New Balance offer because it contains reductions, is there?
>
> A:    No.

*Id.* at 41:19-22.  Along these same lines, Mr. Keflezighi also testified in his deposition that the attachment included in Mr. Capriotti's letter matched the New Balance Offer word for word:

> Q:    So it is a word-for-word match of the terms that New Balance had offered; correct?
>
> A:    Right.

Keflezighi Depo. at 56:7-9.

At the time, however, instead of agreeing that Nike had in fact matched the New Balance Offer, Mr. Keflezighi immediately began devising ways to circumvent the newly formed agreement with Nike.  At 7:14 p.m. on the same day that Mr. Capriotti sent the letter stating that Nike matches the New Balance Offer, Defendant's agent texted John Evans of New Balance, stating in part that "I just got an email from Nike.  It looks like they want to match the offer." Scott Decl. Ex. 9 (Depo. Ex. 27) at 2; Keflezighi Depo. at 60:20-62:12.  Less than a half-hour later, he texted Mr. Evans again, stating: "Spoke with my lawyer.  Got some good advice regarding rights and strategy."  Scott Decl. Ex. 9 (Depo. Ex. 27) at 2; Keflezighi Depo. at 62:16-23.  The focus of this advice was avoiding an agreement with Nike.  Interestingly, at this time,

the advice Mr. Keflezighi received was not to claim that Nike failed to match the New Balance Offer, but to inform Nike that Boris would rather conclude a deal with New Balance—in spite of Nike's decision and right to match.  Keflezighi Depo. at 63:23-64:13.

On the same day, Defendant's agent sent text messages to Defendant's coach, Carlos Handler, who then told Defendant that Nike had matched the New Balance Offer.  Berian Depo. at 44:12-22.  Defendant then texted his agent, indicating that he had heard what happened, but would prefer to go forward with New Balance.  *Id.* at 42:14-43:8.  In response, Defendant's agent wrote: "There's a few ways to get the desired results.  Let me analyze them & get back to you with a good game plan."  Scott Decl. Ex. 10 at 13 (Depo. Ex. 4); Berian Depo. at 42:14-43:8. As Defendant testified, the desired result was to go to New Balance instead of Nike.  Berian Depo. at 45:10-19.  However, none of these communications stated in any way that Nike had failed to match the New Balance Offer.

The fact that Nike had matched the New Balance Offer was also not lost on New Balance itself.  Indeed, Mr. Evans of New Balance told Defendant's agent that it could not enter into an agreement with Defendant given the letter from Mr. Capriotti saying that Nike matches the New Balance Offer:

> Q:    Didn't Mr. Evans tell you, at some point in time shortly after January 22nd, that New Balance could not enter into an agreement with Mr. Berian at that time because of the letter from Mr. Capriotti stating that Nike matches the New Balance offer?
>
> A:    That was something that they were concerned about doing and didn't – a[s] a precaution, didn't take that step.  Which I don't blame them for taking that – making that decision.
>
>      They were concerned. I think there were internal conversations, but they wanted to be safe and couldn't come to agreement.

Page 8   -   NIKE USA, INC.'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

> Q:      And, in fact, they did not enter into a sponsorship
> agreement with Mr. Berian.  They have not, as of yet, entered into
> a sponsorship agreement with Mr. Berian; correct?
>
> A:      That is true.

Keflezighi Depo. 68:19-69:11.

Meanwhile, Nike was unaware of these events and was attempting to move forward with its contractual relationship with Defendant.  After not hearing anything since the February 2, 2016 call, Mr. Cesar of Nike sent Defendant's agent a form contract for review.  2nd Cesar Decl. at 6.  The purpose of this transmittal was to incorporate the terms of the New Balance Offer into a form sponsorship agreement.[1]  *Id.*  Because Defendant's agent had failed to list the lack of standard reductions on the New Balance Offer or otherwise offer evidence beyond his own cover note regarding reductions, Nike included them in the proposed form of contract, but that in no way undermined its commitment to match the New Balance Offer, regardless of whether it included reductions.[2]  *Id.*  Moreover, the proposed form was offered for "review" in the expectation that Defendant's agent would negotiate in good faith to reach a final form.  *Id.*; *see also* Scott Decl. Ex. 11 (Depo. Ex. 20) (noting that the draft long-form contract was being transmitted for Mr. Keflezighi's review).

---

[1] In this regard, Defendant's agent acknowledged that the New Balance offer did not "contain all of the terms that are typically included in a sponsorship agreement, like provisions allowing the sponsor to use the name or image of the athlete" or provisions "that required the athlete to make any appearances on behalf of the sponsor," and he understood that there would necessarily be more communication about those details, but such communications would not change the material terms of the New Balance offer.  Keflezighi Depo. at 46:5-47:3.

[2] It is telling that when push came to shove and Defendant needed a sworn declaration from New Balance regarding reductions for this litigation, he easily obtained one.  Had Defendant's agent done so when Nike requested it in January 2016, Nike would have conceded at that point that the New Balance offer was reduction-free.

Page 9    -    NIKE USA, INC.'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR
                PRELIMINARY INJUNCTION

Rather than moving forward with an agreement, however, Defendant's agent once again responded by arguing that Defendant "has expressed an interest not to resume a relationship with Nike." Scott Decl. Ex. 11 (Depo. Ex. 20). Because it was becoming increasingly apparent that Defendant was not going to comply willingly with his contractual obligations, Nike was forced to retain counsel, who began communications that eventually lead to this action. 2nd Cesar Decl. at 7. Throughout these communications, Nike insisted that it had in fact matched the New Balance Offer. At no point did Defendant or his agent respond that Nike had either failed to match the offer or failed to match the lack of reductions in the New Balance Offer. Indeed, it was not until Defendant retained his current counsel that he advanced any such theory. Scott Decl. at ¶ 13.

### III. ARGUMENT

**A.    Nike Is Likely to Succeed on the Merits That a Contract Existed Between Nike and Defendant as of January 22, 2016.**

**1.    Nike Matched the New Balance Offer.**

There is no dispute that Nike's January 22, 2016 letter to Defendant attached a term sheet that was "an exact copy of [the New Balance Offer] except with all references to 'NB' changed to 'NIKE.'" Opp'n at 7; *see also* Keflezighi Decl. at 56:7-9 ("Q: So it is a word-for-word match of the terms that New Balance had offered; correct? A: Right."). Nonetheless, Defendant still claims that Nike failed to match the New Balance Offer. According to Defendant, because the January 22, 2016 letter asked Defendant to clarify his claim about the New Balance letter's lack of reductions, it was not an unequivocal match. This is incorrect.

Section 5 of the 2015 Contract required Defendant to submit the "specific terms" of New Balance's offer on New Balance letterhead. Defendant did so on January 20, 2016, and, two days later, on January 22, Nike's letter stated in no uncertain terms that "NIKE matches the New

Balance Offer as set forth in [the offer presented on letterhead on January 20, 2016]."  Scott Decl. Ex. 8 (Depo. Ex. 13) at 1; *see also* Cesar Decl. Ex. 4 at 1.  In addition, because Mr. Keflezighi had raised the lack of reductions in his January 20 cover email, Nike's January 22 letter asked for clarification on that issue.  *Id.*  This request for clarification does not change the fact that Nike matched the New Balance Offer on January 22.

As an initial matter, Nike did not condition its acceptance on the outcome of its request for clarification, refuse to match an offer that did not include reductions, or otherwise qualify the offer in any way.  Therefore it should not be construed as a counteroffer.  *See Circle K Stores, Inc. v. Zillman,* 827 F. Supp. 2d 1251, 1256-60 (D. Or. 2011) (genuine issue of material fact as to effectiveness of acceptance where jury could reasonably find requested changes to offer qualified the offer) (cited in Opp'n at 17-18).

Moreover, *until he retained counsel in April, Defendant never informed Nike that he believed it failed to match the New Balance Offer.*  In fact, Defendant treated the January 22 letter as a match of the New Balance Offer.  After receiving Nike's letter on the afternoon of January 22, Mr. Keflezighi texted Mr. Evans of New Balance:  "I just got an email from Nike.  It looks like they want to match the offer."  Scott Decl. Ex. 9 (Depo. Ex. 27) at 2; Keflezighi Depo. at 60:20-62:12.  He also spoke to Defendant's coach, who told Defendant that Nike had matched the New Balance Offer.  Berian Depo. at 44:11-22.  Finally, Mr. Keflezighi proposed a strategy to avoid a future relationship with Nike, based not on Nike's failure to match, but merely on Defendant's desire to move forward with New Balance rather than Nike.  *Id.* at 45:10-19.

Moreover, under Section 5 of the 2015 Contract, Defendant was required to submit the terms he wanted matched on New Balance letterhead.  Cesar Decl. Ex. 1 at § 5.  According to Defendant's brief, it would have been "difficult or impossible" to provide, as Nike requested,

Page 11  -  NIKE USA, INC.'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR
PRELIMINARY INJUNCTION

written documentation from New Balance that the New Balance Offer was intentionally devoid of reductions.  Opp'n at 27.  At his deposition, however, Mr. Keflezighi stated that it would have been "very easy" for him to have done so.  Keflezighi Depo. at 84:12-85:19.  He did not do so. Cesar Decl. at ¶ 8; 2nd Cesar Decl. at ¶ 6.

Under these circumstances, it is disingenuous for Defendant to claim that "Nike failed to completely establish a meeting of the minds over reductions within the 10 days provided to it by section 5," Opp'n at 21, and Defendant cannot defeat Nike's right of first refusal by failing to submit a material term of the New Balance Offer in the required format.  *See Nike USA, Inc. v. Culpepper*, No. 02-868-JE, 2002 U.S. Dist. LEXIS 28777, at *12 (D. Or. July 24, 2002) (holding that Nike was not obligated to match a term not included in third-party offer).

### 2.    A New Contract Was Formed upon Nike's Match of the New Balance Offer.

As Nike explained at length in its Motion (Dkt. No. 6), Defendant's presentation of the New Balance Offer gave Nike an option to enter into an agreement with Defendant on the same terms.  Defendant makes no effort to seriously contradict this argument.  Instead, he argues, without citation to case law, that "[t]hat is not how rights of first refusal work as a general matter, nor how Section 5 in particular was designed."  Opp'n at 20.

As for how rights of first refusal work as a general matter, Defendant is wrong, as evidenced by the extensive case law cited in Nike's Motion.  *See* Motion at 9-10 (collecting cases).  And, as for how Section 5 is properly interpreted, this Court's decision in *Pight v. Catlow-Steens Corp.* is instructive.

Page 12  -    NIKE USA, INC.'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR
                  PRELIMINARY INJUNCTION

In that case, which involved a substantively similar right of first refusal provision,[3] the Court held that the grantor's "notification of the [third-party] offer constituted an offer to sell upon the same terms to [the holder]," and the holder's letter agreeing to match "constituted an attempted acceptance." *Pight v. Catlow-Steens Corp.*, No. CV-80-85, 1982 U.S. Dist. LEXIS 14975, at *8 (D. Or. July 1982) (holding that binding contract was formed when holder gave notice of its exercise of the right of first refusal); *see also Doughty Appliance, Inc. v. White*, 580 P.2d 186, 187 (Or. 1978) ("[N]otification by [defendant] to plaintiff of the opportunity to exercise the right of first refusal was essentially an offer to sell on exactly the terms expressed in the [third-party contract]."). The same is true in this case. *See* TRO (Dkt. No. 24 at 2 ("Nike has shown that it is likely that when, on January 22, 2016, Nike notified Defendant that it agreed to

---

[3] *Compare* Cesar Decl. Ex. 1 at § 5:

> During the Contract Period and for a 180-day period thereafter, NIKE shall have a right of first refusal with regard to any bona fide third-party offer received by ATHLETE and which ATHLETE desires to accept. ATHLETE shall submit in writing to NIKE (on the third-party's letterhead) the specific terms of any such offer. NIKE shall have ten (10) business days from the date of its receipt of such third-party offer to notify ATHLETE in writing if it will enter into a new contract with ATHLETE on terms no less favorable to ATHLETE than the material, measurable and matchable terms of such third-party offer.

*with Pight v. Catlow-Steens Corp.*, No. CV-80-85, 1982 U.S. Dist. LEXIS 14975, at *1-2 (D. Or. July 1982):

> Lessee shall have a right of first refusal to renew this Agreement or to purchase all or a portion of the Premises through June 30, 1981. In the event Owner receives prior to that date, an offer to purchase, lease or transfer any of the assets described above, Owner shall notify Lessee of such offer, setting forth in detail all terms and conditions of that offer and the identity of the offeror. Lessee shall have fifteen (15) days after receipt of said notice to notify Owner in writing of Lessee's exercise of its right of first refusal.

match the terms of the New Balance offer, a contract was formed."); *see also* Berian Depo. at 29:15-30:4 (admitting that Mr. Keflezighi advised Defendant that if Nike matched the New Balance Offer, Defendant would have "no choice" but continue his relationship with Nike).

Defendant's suggestion that Nike's January 22, 2016 letter was nothing more than an agreement to agree also fails.  As an initial matter, to comport with his duty of good faith and fair dealing, Defendant was required to submit to Nike the material terms of the New Balance Offer. Cesar Decl. Ex. 1 at § 5.  And his agent purported to do so on January 20, 2016.  Scott Decl. Ex. 7 (Depo. Ex. 11); *see also* Cesar Decl. Ex. 3.  He should not now be permitted to claim that, because he could have offered additional terms, Nike's acceptance was too uncertain to create a binding contract.  But even putting the issue of bad faith aside, Nike's letter was clearly an agreement to match the *material terms* of New Balance's offer to Defendant, and the mere fact that the parties both planned to execute a more formal agreement after the fact does not mean that the matching letter was not sufficient to create a contract.  *See Culpepper*, 2002 U.S. Dist. LEXIS 28777, at *7-8, *11-12 (acceptance of offer created binding contract, even though terms were thereafter incorporated into formal endorsement contract); *see also Hughes v. Misar*, 76 P.3d 111, 116 (Or. Ct. App. 2003) ("[P]arties who agree on the essential terms of a contract may intend those terms to be binding and, at the same time, implicitly agree to bargain in good faith on the remaining terms.  That fact does not prevent a court from enforcing the parties' agreement.").

### 3. Nike Did Not Repudiate Its Match of the New Balance Offer.

Nike did not repudiate the parties' January 22, 2016 agreement by later sending Defendant a long-form contract that included reductions.  After asking for clarification on the reductions issue, Nike waited three full weeks for Defendant to provide written confirmation

Page 14  -   NIKE USA, INC.'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR
               PRELIMINARY INJUNCTION

from New Balance that reductions were intentionally excluded from the Offer.  *See* Scott Decl. Exs. 8 & 11 (Depo. Exs. 13 & 20).  During this time, though getting the requested information from New Balance would have been "very easy," Mr. Keflezighi failed to do so, because his goal was to get Defendant out of his obligations to Nike.  Keflezighi Depo. at 63:23-64:13.

Thereafter, Nike sent Defendant a form contract.  2nd Cesar Decl. at ¶ 6.  The form included reductions because Nike considered reductions to be "industry-standard," and because Mr. Keflezighi had never indicated whether New Balance included reductions as part of its customary terms.  Cesar Decl. at ¶ 9; 2nd Cesar Decl. at ¶ 6.  However, the form contract was specifically submitted "for [Mr. Keflezighi's] review," and Nike neither insisted on including reductions in any final agreement signed by the parties nor renounced its commitment to match the New Balance Offer, regardless of whether it included reductions.  2nd Cesar Decl. at ¶ 6.  Nike also continued to make clear that it was committed to maintaining its relationship with Nike and *never* stated that it would not match the purported "lack of reductions" term if Defendant submitted it in the proper format.  *See* Scott Decl. Ex. 11 (Depo. Ex. 20); Berian Depo. at 50:25-27, 52:19-53:7; 2nd Cesar Decl. at ¶ 3.  As the sources cited by Defendant make clear, a party only repudiates a contract if it "evinces a *fixed purpose* not to perform the contract" or objectively manifests that it "*unequivocally and absolutely* would not proceed in accordance with its obligations under the agreement."  Opp'n at 21-22, 29 (emphases added).  That is not what happened in this case.

Nor did Nike repudiate the parties' agreement by including a clause that conflicted with the affiliation provision of the New Balance Offer.  Nike clearly matched the affiliation clause in the New Balance Offer.  Scott Decl. Ex. 8 (Depo. Ex. 13) at 7.  However, that clause cannot be read to allow Defendant to wear New Balance footwear and apparel.  The affiliation clause

Page 15  -   NIKE USA, INC.'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR
PRELIMINARY INJUNCTION

merely provides that Defendant would be permitted to compete under the Big Bear Track Club affiliation and to wear the club's "official uniform and footwear . . . in all domestic competitions." *Id.*  At the time Nike matched the New Balance Offer, the Big Bear Track Club was not sponsored by New Balance.  In fact, it was not until January 27, 2016, several days after Nike matched and a new contract was formed, that  Mr. Keflezighi informed Nike that New Balance had decided to sponsor the Big Bear Track Club.  2nd Keflezighi Decl. at ¶ 14.  And, as Defendant even argues, "[a] court will not deem a party's reasonable expectations thwarted based on circumstances that exist at the signing of the contract."  Opp'n at 30 (citing *Pride v. Exxon Corp.*, 911 F.2d 251, 256 (9th Cir. 1990) (Oregon law)).

Moreover, even if Nike had known on January 22, 2016 that New Balance was the Big Bear Track Club sponsor (or would be in the near future), the affiliation clause in the New Balance Offer has no economic value to Defendant and was inserted solely to make it impossible for Nike to match the New Balance Offer.  Keflezighi Depo. at 39:20-24, 52:24-53:13; Berian Depo. at 30:22-32:1, 46:5-19.  Therefore, it is clearly an unenforceable "poison pill" that did not have to be matched by Nike.  *See Or. RSA No. 6*, 76 F.3d at 1007 (noting that every contract under Oregon law includes an implied covenant of good faith and fair dealing, and rejecting attempt to avoid right of first refusal provision through an "artifice intended to thwart plaintiff's legitimate contractual expectation"); *see also Davis v. Iofredo*, 713 N.E.2d 26, 28 (Ohio Ct. App. 1998) (right of first refusal may not be defeated by special or peculiar terms not made in good faith); *Brownies Creek Collieries, Inc. v. Asher Coal Mining Co.*, 417 S.W.2d 249, 252 (Ky. Ct. App. 1967) (same).

**4.    Injunctive Relief Is an Appropriate Remedy in This Case.**

Finally, Defendant's suggestion that Nike was not likely to succeed on the merits because it is improperly seeking an injunction to compel specific performance of a personal services contract also fails.  Contrary to Defendant's assertions, Nike is not seeking specific performance in this case.  Instead, Nike seeks a negative injunction *preventing* Defendant from wearing and endorsing its competitor's products.  And, as explained in the Motion, several courts, including this one, have granted injunctive relief under the same or similar circumstances.  *See Culpepper*, 2002 U.S. Dist. LEXIS 28777, at *14 (enjoining professional athlete endorser "and/or anyone acting in concert with [him] . . . from any conduct that enters into or furthers an endorsement relationship with Reebok or any other Nike competitor pending final resolution on the merits"); *Houston Oilers, Inc. v. Neely*, 361 F.2d 36, 40 (10th Cir. 1966) (enjoining football player from playing for competing organization); *Wash. Capitols Basketball Club, Inc. v. Barry*, 304 F. Supp. 1193, 1197 (N.D. Cal. 1969) ("[P]recedents for granting injunctive relief against 'star' athletes 'jumping' their contracts … are numerous."); *Lemat Corp. v. Barry*, 275 Cal. App. 2d 671, 675 (1969) (affirming injunction preventing professional athlete from playing with competitor); *see also MCA Records, Inc. v. Newton-John*, 90 Cal. App. 3d 18, 24 (1979) (affirming injunction restraining pop star from recording for MCA's competitors).

**B.    Nike Will Suffer Irreparable Harm Absent an Injunction.**

Defendant's efforts to avoid preliminary injunctive relief by arguing that Nike will not suffer irreparable harm also fail.  At the outset, Defendant mistakenly argues that Nike has not attempted to quantify the loss it would suffer if Defendant is permitted to move to a competitor

and that any such loss would be insubstantial.[4]  Opp'n at 28.  But Nike cannot quantify the loss it would suffer, which is the precise reason the harm is irreparable.  *Ocean Beauty Seafoods, LLC v. Pac. Seafood Grp. Acquisition Co.,* 2016 WL 1554942, at *2 (9th Cir. Apr. 18, 2016) (where "harm is intangible and difficult to quantify, it qualifies as irreparable"); *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm.").

Moreover, Defendant's suggestion that the harm would be insubstantial given that he is only an emerging track star is belied by the fact that Nike was willing to match the multi-year contract proposed by New Balance, which dramatically increased his base compensation. Indeed, Defendant himself recognizes his own value, arguing that he has "an opportunity *right now* to ink a multi-year endorsement contract while he stands [at] the top of his field and with these high profile events [the Olympic Trials and the Olympics] immediately ahead."  Opp'n at 32.  As Mr. Cesar of Nike stated in his initial Declaration, "[t]he Olympics and Olympic Trials are held once every four years.  Mr. Berian's participation and potential for success in such events make his endorsement a unique marketing and promotional opportunity."  Cesar Decl. at ¶ 14.  The harm of losing such a marketing and promotional opportunity cannot be overstated, and that harm would be compounded still further by the loss of Nike's goodwill, should Defendant be permitted to jump to a competitor.

---

[4] It appears, based on his brief, that Defendant fundamentally misunderstands what irreparable harm is.  Even the basic definition clears this up: "An injury that cannot be adequately measured or compensated by money. . . ."  *Irreparable Injury, Black's Law Dictionary* (10th ed. 2014).

Page 18   -   NIKE USA, INC.'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

The irreparable nature of the harm to Nike is further confirmed by the rulings of multiple courts that have issued or upheld the issuance of preliminary injunctive relief under similar circumstances, including this very Court.  *Culpepper*, 2002 U.S. Dist. LEXIS 28777, at *14 (holding loss of athlete endorser likely to cause irreparable harm to Nike); s*ee also Wash. Capitols Basketball Club,* 304 F. Supp. at 1197 (holding irreparable harm likely if team denied services of athlete); *Lemat Corp.*, 275 Cal. App. 2d at 675 (1969) (same); *see also Ocean Beauty Seafoods,* 2016 WL 1554942, at *2 (non-compete agreement afforded protection to "a legitimate interest" of former employer, so breach of the agreement occasion[ed] [irreparable] harm").

Finally, Defendant's continued suggestion that the Affiliation clause in the New Balance Offer should somehow permit him to wear New Balance footwear ignores the fact that the Affiliation clause is clearly an unenforceable "poison pill" for the reasons already stated.  Indeed, both Defendant and his agent explicitly admitted that the sole purpose of this provision was to preclude Nike from matching the New Balance Offer.  To allow Defendant to escape injunctive relief based on such a provision would reward both Defendant and his agent for what was clearly a bad faith effort to avoid the right of first refusal provision in Nike's contract.

## C.    The Balance Of Hardships Tips In Nike's Favor.

Defendant's claims that the balance of hardships tips in his favor also fall short.  While Defendant ominously claims that changing shoes will negatively affect his performance, there is no evidence to support any such conclusion.  Defendant ran in Nike shoes by choice in both high school and college.  Berian Depo. at 12:24-13:3.  Moreover, he willingly switched from New Balance shoes to Nike shoes when he entered the 2015 sponsorship agreement with Nike and he went on to run his career-best 800m race shortly thereafter.  *Id.* at 13:4-18, 16:15-22.  In addition, Defendant admitted that his training in Nike shoes was going well as late as December

Page 19   -   NIKE USA, INC.'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR
                   PRELIMINARY INJUNCTION

of 2015 and that, before this dispute, he never complained about his footwear.  *Id.* at 14:1-15:7, 51:21-23.  There are simply no credible facts suggesting Mr. Berian's performance has been or will be impaired by wearing Nike footwear.  A sole, self-serving declaration by his agent—that is contradicted by Mr. Berian's actual racing history—is simply not enough.  Under such circumstances, Defendant's claims that he would be harmed by wearing Nike shoes ring hollow, at best.  *Culpepper*, 2002 U.S. Dist. LEXIS 28777, at *14 (concluding balance of equities weighed in favor of Nike because the defendant "had no difficulty in wearing and endorsing Nike products consistently throughout . . . his career").

Defendant's additional claims that an injunction would harm him by preventing him from immediately entering a new endorsement contract also fail.  While Defendant argues that Nike might not pay him if he is competing in Nike footwear pursuant to a preliminary injunction, that is simply not the case.  2nd Cesar Decl. at ¶ 8.  Nike is committed to continuing its relationship with Defendant, which is the very reason it initiated this litigation.  The last thing Nike would do is fail to pay Defendant in a manner that would jeopardize that relationship.[5]

Finally, Defendant's argument that he might forever lose the opportunity to sell his endorsement and leverage his top-level performance in advance of the Olympics ignores the fact *that he already did just that when he negotiated the New Balance Offer that Nike matched.*  The New Balance Offer, which Nike clearly matched, included a significantly higher level of base compensation than his original contract with Nike, directly reflecting his strong performance and prospects.  As a result, unless Defendant continues to attempt to block the enforcement of such a

---

[5] In this regard, it is noteworthy that Nike repeatedly attempted to pay Defendant after matching the New Balance Offer, but Defendant refused to accept such payment.  Cesar Decl. at ¶ 11.

Page 20  -    NIKE USA, INC.'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

contract after the Olympics, he will get exactly the deal he and his agent negotiated. *Id.* at ¶ 8. Indeed, given that Nike is *merely attempting to enforce the terms of an agreement that Defendant was clearly willing to accept*, there is no basis to conclude that he will be harmed by preliminary injunctive relief. Moreover, any claim that the balance of equities favors Defendant is undermined still further by the fact that Defendant and his agent deliberately attempted to avoid the right of first refusal provision in Nike's contract by inserting a poison pill provision in the New Balance Offer and then simply ignoring the fact that Nike clearly matched that offer. *See, e.g., United States v. Jenkins*, 714 F. Supp. 2d 1213, 1224 (S.D. Ga. 2008) (noting that "equity does not shine on those with unclean hands," weighing defendant's unclean hands against him in balancing of equities, and awarding injunction).[6]

**D.      The Public Interest Is A Neutral Factor In This Case.**

A recent Ninth Circuit decision undercuts defendant's argument that the public interest weighs against an injunction in this case. In *Ocean Beauty Seafoods, LLC v. Pacific Seafood Group Acquisition Co., Inc.*, the Ninth Circuit determined that "the public [did] not weigh heavily" in its decision to award an employer an injunction preventing a former employee from working for a competitor. 2016 WL 1554942, at *2. The Court explained its decision as follows:

> The interests at stake are primarily private, and what public interest
> there is incorporates competing policies: The freedom to pursue
> one's chosen occupation is in tension with freedom of contract,
> and the advocate of competition must grapple with the argument

---

[6] Defendant's suggestion that an injunction would cause him irreparable harm by infringing on his First Amendment rights is utterly without merit. The mere attempt to enforce a sponsorship *agreement* cannot constitute an infringement of Defendant's First Amendment rights. If that were the case, no such agreements would be enforceable.

that noncompete agreements are economically advantageous
because they protect costly investments.

The same is true here.  Because this is a contract dispute between two private parties, the

public interest is a non-factor in this case.  *Id.*; *see also Marquez Bros. Int'l v. Atletico Morelia*

*S.A. De C.V.*, No. 5:05-CV-1889 RS, 2005 WL 1869501, at *8 (N.D. Cal. Aug. 5, 2005)

(sponsorship dispute was a "contract dispute between two private parties" and therefore was "not

a public interest case").

## IV.  CONCLUSION.

For all of the foregoing reasons, the Court should grant the preliminary injunctive relief

requested by Nike.

DATED:  June 21, 2016.

STOEL RIVES LLP

*s/ Per A. Ramfjord*
PER A. RAMFJORD, OSB No. 934024
paramfjord@stoel.com
KENNON SCOTT, OSB No. 144280
kennon.scott@stoel.com

Attorneys for Plaintiff Nike USA, Inc.